# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

**LUTHER W. ROYAL and
ROYAL COMMERCIAL
REFRIGERATION, INC.,**

**Plaintiffs,**

v.                    **6:10-cv-104**

**NEW YORK LIFE INSURANCE
COMPANY, THE PAUL REVERE LIFE
INSURANCE COMPANY, and UNUM
GROUP,**

**Defendants.**

## ORDER

## I. INTRODUCTION

Before the Court are New York Life Insurance Company's, The Paul Revere Life Insurance Company's ("Paul Revere"), and Unum Group's (collectively "Defendants") Motion for Summary Judgment, ECF No. 35, and Luther W. Royal's ("Royal") and Royal Commercial Refrigeration, Inc.'s ("RCR") (collectively "Plaintiffs") Motion for Summary Judgment, ECF No. 37.

Royal originally filed this suit in state court seeking the full amount of benefit payments he alleges Defendants owe him under his disability insurance policy. ECF No. 1-1. Defendants removed the case to this Court on the basis of diversity jurisdiction. ECF No. 1. Then, in their Answer, Defendants advanced a counterclaim alleging that Royal fraudulently obtained payments under the disability insurance policy. ECF No. 4 at

22-23. RCR was later joined as a party. ECF No. 21.

Defendants now move for summary judgment, arguing that Royal cannot establish that he is owed any benefits under the terms of the policy. *See* ECF No. 35-17 at 2-3. Royal, on the other hand, has moved for summary judgment as to Defendants' counterclaim, arguing that the statute of limitations bars the claim. *See* ECF No. 37 at 1.

For the reasons set forth below the Court *GRANTS* Defendants' motion for summary judgment, ECF No. 35, and *GRANTS IN PART* and *DENIES IN PART* Plaintiffs' motion for summary judgment, ECF No. 37.

## II. BACKGROUND

Royal applied for a disability income insurance policy through New York Life Insurance Company in 1988. ECF Nos. 35-16 at 1; 43-3 at 1. RCR was to be the policy's owner and Royal was to be the insured. ECF Nos. 35-16 at 1; 43-3 at 1. New York Life issued Policy No. H3 075 810 ("the Policy") which, after amendment, had an effective date of March 8, 1988. *See* ECF Nos. 35-16 at 2; 43-3 at 2. In the event of total disability, the Policy provided for a monthly benefit of $6,000. ECF Nos. 35-16 at 3; 43-3 at 2. In the event of residual disability, on the other hand, the Policy provided for a proportional benefit constituting a percentage of the total disability benefit. ECF Nos. 35-16 at 3; 43-3 at 2. In November 1999, New York Life sold a block of insurance policies, which included the Policy, to Paul Revere. ECF Nos. 35-16 at 8; 43-3 at 8. After this sale, Paul Revere assumed responsibility for

administering claims under the Policy. ECF Nos. 35-16 at 8; 43-3 at 8.

On February 9, 2004, Royal submitted a claim to Paul Revere for total disability benefits under the Policy. ECF No. 35-16 at 8; 43-3 at 9. His claim alleged that he injured his knee and back in June of 2002 and that he had only been able to return to part-time work of ten to fifteen hours per week on January 30, 2003. ECF Nos. 35-16 at 9; 43-3 at 9. After filing this initial claim, from March 2004 through September 2006, Royal regularly submitted further proof of loss in support of his claim for benefits. ECF Nos. 35-16 at 9; 43-3 at 10. The proof of loss submitted included Claimant's Supplemental Statements provided by the insurer, medical information, and occupational information. ECF Nos. 35-16 at 9; 43-3 at 11.

Pursuant to this claim and proof of loss, Paul Revere paid out total disability benefits of $6,000 per month from June 1, 2002, through January 31, 2003. ECF Nos. 35-16 at 11; 43-3 at 12. After this period of total disability, Paul Revere continued to pay residual disability benefits, totaling $142,615.22, from February 1, 2003, to April 1, 2006. ECF Nos. 35-16 at 11; 43-3 at 13.

In May of 2006, however, Paul Revere received a tip on its fraud hotline from Betty Whitehead, a long-time office manager of RCR. ECF Nos. 35-16 at 11; 43-3 at 14. Pursuant to this tip, Paul Revere instituted an in-depth investigation into Royal's benefits claims, which included surveillance and an audit of RCR's business records. ECF Nos. 35-16 at 12; 43-3 at 15. Based on this investigation, Paul Revere submitted a Suspected Fraud Referral Form to the Office of Commissioner of Insurance. ECF Nos. 35-7; 35-16 at 18; 43-3 at 23. Paul Revere also determined that Royal was not, and had not, been eligible for benefits under the Policy and, on October 31, 2006, notified Royal that it was closing his claim. ECF No. 35-16 at 18; 43-3 at 24.

On November 3, 2010, Royal filed this claim in Georgia state court seeking recovery of benefits allegedly due under the Policy. ECF No. 1-1. Defendants removed the case to this Court on December 8, 2010. ECF No. 1. On December 15, 2010, Defendants filed their Answer to Royal's Complaint as well as a counterclaim seeking damages for Royal's allegedly fraudulent benefits claims. ECF No. 4. Then, on January 21, 2011, the Court administratively closed the case pending the conclusion of a Royal's related criminal proceeding. ECF No. 11. On August 29, 2013, after a jury acquitted Royal, the Court re-opened the case. ECF No. 13.

On September 3, 2014, both parties moved for summary judgment—Defendants as to all of Royal's claims and Royal as to Defendants' Counterclaim. ECF Nos. 35; 37. After some delay, the motions are now ripe for adjudication.

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on summary judgment, the Court views the facts and inferences from the

2

record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008). Courts, moreover, may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Reese*, 527 F.3d at 1268 (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Property in Green and Tuscaloosa Cntys. in the State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991).

Once the moving party has satisfied its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.

1993). The nonmoving party, however, "may not rest upon the mere allegations or denials of [its] pleading[s], but . . . must set forth specific facts showing that there is a genuine issue for trial." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

Further, "[f]or issues on which the non-movant would bear the burden of proof at trial," the means of rebuttal available to the non-movant differs depending upon how the movant satisfied its "initial responsibility." *See Fitzpatrick*, 2 F.3d at 1116. If the movant has offered evidence affirmatively negating an issue, "the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the [issue] sought to be negated." *Id.* On the other hand, where the movant has "instead demonstrated an absence of evidence on the issue," the nonmovant may either "show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict," or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17.

## IV. ANALYSIS

The Court will now take the parties' motions up in turn, starting with Defendants' motion for summary judgment before turning to Royal's motion for summary judgment on Defendants' counterclaim.

### A. The Court's Jurisdiction[1]

Before turning to the merits of the parties' motions, the Court first determines whether it has jurisdiction over this case. Defendants removed this case from state court on the basis of the Court's diversity jurisdiction, 28 U.S.C. § 1332. ECF No. 1 at 4. In the Notice of Removal, Defendants allege that Royal is a citizen of Georgia, that New York Life is a New York mutual insurance company with its principal place of business in New York, that Paul Revere is a Massachusetts corporation with its principal place of business in Massachusetts, and that Unum Group is a Delaware corporation with its principal place of business in Tennessee. *Id.* at 2.[2]

On initial review, it is unclear whether this Notice of Removal sufficiently alleges diversity of citizenship for purposes of jurisdiction under 28 U.S.C. § 1332. Two of the three defendants possibly are limited liability companies that take the citizenship "of any state of which a member of the company is a citizen." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings, L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). However, a further review of the authority on point satisfies the Court that it does indeed have jurisdiction over this case and will proceed to the merits of the parties' motions.

"If an entity is treated as a corporation under state law, it matters not for purposes of diversity jurisdiction whether the corporation is formally shareless or has members rather than shareholders." *Barnett v. Norfolk & Dedham Mut. Fire Ins. Co.*, 773 F. Supp. 1529, 1531 (N.D. Ga. 1991); *see also Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 89 (2d Cir. 1983) (finding that whether an entity "is a corporation for diversity purposes must be determined by [state] law"). Under both Massachusetts law and New York law, unincorporated and incorporated insurance entities are subject to the same regulations. *See* Mass. Gen. Laws Ann. ch. 175, § 1 (defining "Company" as "all corporations, associations, partnerships or individuals engaged in the business of insurance); N.Y. Ins. Law § 107(15) ("'Company' means corporation."). Further, both New York and Massachusetts treat incorporated and unincorporated insurance

---

[1] Neither party addressed the applicability of the Employee Retirement Income Security Act ("ERISA"). If ERISA applied, diversity of citizenship would be unnecessary as "ERISA claims arise under federal law." *Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1104 (11th Cir. 1999). ERISA, however, does not apply, because although Royal is an employee of RCR, he is also the sole shareholder of the corporation. ECF No. 36 at 34. And sole shareholders are not "'employees' for the purpose of determining if a plan is covered by ERISA." *Gilbert v. Alta Health & Life Ins. Co.*, 276 F.3d 1292, 1303 (11th Cir. 2001) (relying on 29 C.F.R. § 2510.3-3(c)(1)).

[2] After removal, Royal moved the Court to add RCR as a party to the case. ECF No. 17. The Court granted Royal's motion. ECF No. 21. RCR is a Georgia corporation with its principal place of business in Georgia. ECF No. 17. Therefore, RCR's

joinder does not affect the Court's jurisdictional inquiry.

entities the same in terms of business organization, conduct of business, and business combinations. *See* N.Y. Ins. Law §§ 1201, 7101-21; *see, e.g.*, Mass. Gen. Laws Ann. ch. 175, §§ 18, 19a.

Accordingly, the Court considers both New York Life and Paul Revere corporations for purposes of 28 U.S.C. § 1332 and finds that the Notice of Removal adequately alleged diversity of citizenship. *See New York Life Ins. Co. v. TWR Props. LLC*, 2007 WL 2310074, at *2 n.2 (M.D. GA. Aug. 9, 2007); *Barnett*, 773 F. Supp. at 1531.

## B. Procedural Matters

This case has undergone a protracted briefing period in which deadlines for filing were extended several times. Therefore, it is important to address some procedural matters at the outset.

### 1. Local Rule 56.1

Under Local Rule 56.1, motions for summary judgment are to be accompanied by "a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof." LR 56.1, SDGa. Parties must support each statement of material fact with citation to the record. *Id.* Opposing parties served with Local Rule 56.1 statements have twenty-one days from the date of service to respond with a statement of their own. *See id.* The Court deems admitted all unopposed, evidentially supported facts. *Scoggins v. Arrow Trucking Co.*, 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000).

Here, Defendants attached a Local Rule 56.1 statement to their motion for summary judgment with every factual assertion supported by a citation to the record. *See generally* ECF No. 35-16. In response, Royal failed in large part to comply with Local Rule 56.1's requirement that all factual assertions be supported by citation to the record. *See generally* ECF No. 43-3. Indeed, only nineteen paragraphs of Royal's 138-paragraph Local Rule 56.1 response have any sort of citation to the record or authority at all. *Id.* at ¶¶ 2, 6, 11, 16, 41, 43-49, 52, 67, 82, 96, 132-33, 136. That number, however, overstates the support provided for Royal's response as some of those paragraphs contain cites that merely identify the document the paragraph purports to respond to, *e.g.*, *id.* at ¶ 16, six paragraphs are cut-and-copied paragraphs that merely identify a document that Defendants attached to their motion for summary judgment, *id.* at ¶¶ 44-49, and one paragraph cites to an exhibit that does not exist, *id.* at ¶ 82. Further, some of Royal's numbered paragraphs are not statements at all, but rather are nearly-page-long, unsupported arguments masquerading as statements of material fact. *Id.* at ¶¶ 11, 16, 42, 96.

"[L]ocal rule 56.1 is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (applying LR 56.1, NDGa). Despite clearly being aware of Local Rule 56.1's requirements, and the consequences for not complying with those requirements, *see* ECF No. 43 at 2, Royal's Local Rule 56.1 statement is "convoluted,

argumentative[,] and [largely] non-responsive." *See Mann*, 588 F.3d at 1303. Apparently aware of his original response's inadequacy, Royal submitted a "Recast Response" to Defendants' Local Rule 56.1 statement over a month after the already extended time for responding to Defendants' motion for summary judgment had expired, ECF No. 61-1. Royal, however, did not ask for leave to file an amended Local Rule 56.1 statement, but rather attempted to do so under the guise of filing a sur reply to Defendants' reply. *See* ECF No. 61. In doing so, Royal attempts to marshal a litany of new evidence and facts before the Court. *E.g.*, ECF Nos. 61-2 to -11, -13 to -17 (totaling 452 pages). The Court will not consider this "Recast Response," because, among other reasons explained in greater detail below, submission of completely new evidence in reply briefs generally is improper. *See Hegre v. Alberto-Culver USA, Inc.*, 508 F. Supp. 2d 1320, 1327 (S.D. Ga. 2007) (citing *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 311 n.82 (S.D. Ala. 2006)).

This is not to say that Royal's Local Rule 56.1 response was his only opportunity to controvert Defendants' Local Rule 56.1 statement. The Southern District of Georgia allows responding parties to controvert Local Rule 56.1 statements through evidentiary materials referenced in, and attached to, responsive briefs. *See Bank of the Ozarks v. Kingsland Hospitality, LLC*, 2012 WL 5928642, at *5 (S.D. Ga. Oct. 5, 2012). However, Royal's brief in response to Defendants' motion for summary judgment largely fails to effectively controvert Defendants' Local Rule 56.1

Statement. Only one affidavit accompanies Royal's brief and the brief cites to that affidavit only three times. *See* ECF No. 43 at 4 (citing ECF No. 43-2 (Affidavit of Roger Crews)).

Accordingly, to the extent that Royal's original response, along with his brief in response to Defendants' motion and the evidence attached to that brief, fails to controvert Defendants' evidentially supported statements of material fact, the Court will deem those facts admitted. *See Mann*, 588 F.3d at 1303; *see also Ponder v. M/V CHILBAR*, 234 F. Supp. 2d 1355, 1356 n.2 (S.D. Ga. 2002) ("Unrebutted, evidentially supported Fact Statements are deemed admitted under S.D. Ga. Local Rule 56.1 . . . .").

## 2. Royal's Sur Reply

As noted above, Royal's purported sur reply filed in response to Defendants' reply in support of their motion for summary judgment advances a significant amount of new evidence. While troubling, such improper submission of new evidence is less problematic in this Court in light of its liberal reply-brief policy, allowing parties to "file as many reply briefs as they want." *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D. Ga. 2003). Accordingly, though Royal submitted new evidence on sur reply, such new evidence does not necessarily prejudice Defendants, as they were free to notice their intent to file an additional sur reply.

What is more troubling, however, is the nature of Royal's purported sur reply. In reality, Royal's sur reply is not a sur reply at all. Rather, it is a resubmission of his

response to Defendants' motion for summary judgment. Indeed, after two extensions of time to file his sur reply, Royal submitted to the Court the *exact* same brief submitted as his response to Defendants' motion for summary judgment. Even the title and the date of the brief remain the same. *Compare* ECF No. 43, *with* ECF No. 61. Thus, not only has Royal submitted new evidence at the sur reply stage of his briefing, he has gamed the Court's liberal reply-brief policy and attempted to take another bite at responding to Defendants' motion for summary judgment, this time with a properly supported motion. To be sure, Royal's actual sur reply appears to be forthcoming still. ECF No. 62 (Notice of Intent to File Supplemental Sur-Reply Brief).

Plainly, Royal seeks to use his sur reply in a manner incompatible with its purpose. The purpose of a sur reply is to rebut arguments advanced in an opposing party's reply brief or explain a position that the opposing party has attempted to refute. *See Dehaarte v. City of Newark*, 2006 WL 561925, at *2 (D.N.J. Mar. 7, 2006); *see also* 16AA Arthur R. Miller et al., Federal Practice and Procedure § 3975.3, at 284 (addressing appellate practice and stating "a reply brief is allowed in order to address new issues raised in the appellee's brief"). In this way, replies and sur replies benefit the Court in resolving disputes. *See Podger*, 212 F.R.D. at 609. For that reason, some courts in the Eleventh Circuit "will not grant leave to file a reply brief unless the reply will benefit the Court's resolution of the pending motion." *See, e.g., Gadsby v. Am. Golf Corp. of Cal.*, 2014 WL 5473555, at

*15 (M.D. Fla. Oct. 28, 2014) (adopting the Magistrate Judge's Report and Recommendation).

As noted earlier, this Court adopts a liberal stance on reply briefs. However, liberally allowing filing of reply briefs does not abrogate the purpose of reply briefs—i.e., rebutting arguments made in responses and replies. Royal's purported sur reply provides no rebuttal to Defendants' reply. Instead, Royal's sur reply seeks to more fully support his response to Defendants' motion for summary judgment by "recasting" his Local Rule 56.1 statement and providing the evidentiary support that was so palpably absent from his initial submission. But time ran for responding to Defendants' motion for summary judgment on October 14, 2014. *See* ECF No. 41. Royal clearly is familiar with the procedure for extending filing deadlines, *see* ECF Nos. 40; 48; 55; 57; 63 (all motions for extension of time), yet he did not ask the Court to further extend the time for filing his response, nor has he requested leave to amend his response. Instead, Royal chose to attempt to pull the wool over the Court's eyes and take more time than was allowed in responding to Defendants' motion for summary judgment. But he is not tricked who knows he is being tricked.

To allow Royal to more fully respond to Defendants' motion for summary judgment at this late stage would be unduly prejudicial to Defendants and would provide the Court little aid in deciding Defendants' motion. The consequence of interpreting the Court's liberal reply policy to allow such supplementation of responses to summary judgment would allow attorneys to submit

bare-bones responses as a sort of temporal bookmark by which they could preserve their right to respond while taking more time than the Rules allow to gather evidence and to formulate an argument. *Cf.* 5 Wright & Miller, Federal Practice and Procedure § 1194, at 65-66 (3d ed. 2004) ("The general concern regarding a permissive attitude toward amendment of motions is that lawyers will be tempted to file them in skeletal form and rely on their ability to expand or add new grounds at a later time."). The Court will not allow such an abuse of procedure. *Cf. id.* at § 1194, at 66 (stating that the district court may "deny leave to amend when [it] believes the amendment process is being abused . . ."). Therefore, the Court finds that none of the evidence submitted as Royal's sur reply is properly before the Court and will not consider it in deciding Defendants' motion for summary judgment.

## C. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on the basis that Royal cannot establish entitlement to benefits under the Policy for the months claimed—i.e., April 2006 through March 2012. *See* ECF No. 35-17 at 2-3. Specifically, Defendants argue that because Royal would have the burden of proving entitlement to benefits, they are entitled to summary judgment as there is an absence of evidence in the record to sustain Royal's cause of action. *See* ECF Nos. 35-17 at 5-6; 50 at 6-7.

## 1. Royal's Cause of Action and the Burdens at Trial

Royal's cause of action seeks to recover benefits allegedly owed under the Policy. *See* ECF No. 1-1. In order to determine whether Royal is entitled to benefits under the Policy, the Court looks to Georgia law. *See Hudson Ins. Co. v. Am. Elec. Corp.*, 957 F.2d 826, 828 (11th Cir. 1992) ("A suit to recover insurance proceeds is created by state law.").

Under Georgia law, insurance policies simply are contracts and are construed as such. *See Hunnicutt v. S. Farm Bureau Ins. Co.*, 351 S.E.2d 638, 640 (Ga. 1987). "[T]he parties are bound by the terms of the policy." *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 249 (Ga. Ct. App. 1976).

The party claiming entitlement to benefits under an insurance policy "has the burden of proving that a claim falls within the coverage of the policy." *Ga. Farm Bureau Ins. Co. v. Hall Cnty.*, 586 S.E.2d 715, 717 (Ga. Ct. App. 2003). Georgia courts long have "held that contract disputes are well suited for adjudication by summary judgment because construction of a contract is ordinarily a matter of law for the court." *Maxum Indem. Co. v. Jimenez*, 734 S.E.2d 499, 501 (Ga. Ct. App. 2012) (quotation omitted).

Thus, the burden is on Royal to prove that he is entitled to benefits under the terms of the Policy.[3] As the moving party at the

---

[3] Royal, without support, argues that Defendants bear "the burden of proof with respect to showing that [he] has undergone a change of condition for the better" in order to justify the termination of his claim. *See* ECF

summary judgment stage, therefore, Defendants must either point to an absence of evidence in the record showing that Royal is entitled to benefits under the policy or come forth with affirmative evidence demonstrating that Royal cannot prove entitlement to benefits. *See Four Parcels*, 941 F.2d at 1438.

## 2. The Policy

"The construction of insurance contracts is governed by substantive state law." *Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir. 1985). In construing insurance policies, Georgia courts "undertake[] a three-step process in the construction of the contract, the first of which is to determine if the instrument's language is clear and unambiguous." *RLI Ins. v. Highlands on Ponce, LLC*, 635 S.E.2d 168, 171 (Ga. Ct. App. 2006). Where the language is found to be clear and

unambiguous, "the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning." *Id.* However, if the court finds an ambiguity, the existence of which "is a question of law for the court," the court must "attempt to resolve the ambiguity by applying the rules of construction in O.C.G.A. § 13-2-2." *Woody's Steaks, LLC v. Pastoria*, 584 S.E.2d 41, 43 (Ga. Ct. App. 2003). Only if the ambiguity persists after applying the rules of construction does the resolution of the ambiguity become a jury question. *Id.*

### a. True Copy

Before turning to the terms of the Policy, the Court must identify the document to be construed. Royal denies that the Policy attached to Defendants' motion for summary judgment is a true copy of the Policy, but he offers no grounds for that dispute other than stating the Policy "is *not* the same as the copy of the Policy which Defendants produced in response to discovery by Royal in the criminal action against him." ECF No. 43-3 at 1. That copy, Royal alleges, was attached to his original Complaint. *Id.*

But the alleged true copy attached to Royal's Complaint is incomplete in that it is missing the sections of the policy governing claims, premiums, and the right to renew the policy. *Compare* ECF No. 1-1 (missing pages six and seven), *with* ECF No. 35-2. Royal offers no explanation for the missing pages and fails to controvert any of Defendants' factual statements regarding the terms of the Policy attached to their motion for summary judgment. *See* ECF No. 43-2 at 2-7. Indeed, when stating in conclusory fashion that "the Policy speaks for itself,"

---

No. 43 at 4. The Court's independent search for such a burden shift applicable to Royal's claims has turned up empty.

Under Georgia's Worker's Compensation statute, "when an employer unilaterally suspends benefits, the burden of proof is on the employer to prove that the claimant has undergone a change in condition." *Reliance Elec. Co. v. Brightwell*, 643 S.E.2d 742, 744 (Ga. Ct. App. 2007). Perhaps this requirement is the source of Royal's "change in condition" argument. But this plainly is not a Worker's Compensation case. Also, courts considering similar actions under ERISA, which places the burden of proving "entitlement to contractual benefits" on the claimant, *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998), have rejected such burden shifting, *see Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 & n.3 (9th Cir. 2010) (considering and rejecting a burden-shifting argument).

To be sure, if Defendants were seeking to claim the applicability of a policy exclusion, they would bear the burden of proving its applicability. *E.g., First Specialty Ins. Corp. v. Flowers*, 644 S.E.2d 453, 455 (Ga. Ct. App. 2007). But that is not the case here.

Royal cites to the Policy attached to Defendants' motion for summary judgment as the Policy that is to be construed. *E.g.*, *id.* at 3. The Court's own comparison of the two copies reveals that the only difference between the two is that Defendants' copy includes pages six and seven, and Royal's does not—an omission that makes the Policy unintelligible.[4]

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Plainly, "mere conclusions and unsupported factual allegations are legally insufficient to" create a genuine issue of material fact. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th 2005). Therefore, the Court finds that threadbare contention that the Policy attached to Defendants' motion for summary judgment is not a "true copy" of the Policy is not sufficient to create a genuine dispute as to the authenticity of that Policy. As such, the Court will construe that document in determining the terms of Royal's Policy.

---

[4] The Policy attached to Defendants' motion for summary judgment does incorrectly reflect a monthly income benefit of $2,500. *See* ECF No. 35-2 at 3. Royal's monthly income benefit was later changed to $6,000. This change is reflected in the incomplete copy of the Policy attached to Royal's Complaint. ECF No. 1-1 at 10. There is no dispute between the parties "that the monthly benefit for total disability under the policy is $6,000." ECF No. 36 at 11 (deposition of Luther W. Royal).

**b.     The Terms of the Policy and the Claims Process**

The Court will now set forth the Policy's clear terms.  The Policy, issued by New York Life, is a "Premier Disability Income Policy." ECF No. 35-2 at 2.  "Disability insurance is designed to provide protection from loss of income caused by an injury or disease which either limits or destroys the insured's ability to work." 10A Couch on Insurance § 146:2 (3d ed., Westlaw updated Nov. 2014).

Royal's Policy provided a monthly income benefit for both total and residual disability with a maximum benefit term extending to Royal's sixty-fifth birthday or two years of benefit payments, "whichever term [was] longer." ECF No. 35-2 at 3. The total disability benefit available under the policy was $6,000 per month. *See* ECF No. 36 at 11 (deposition of Luther W. Royal).

Before benefits were payable under the Policy, Royal had to satisfy an elimination period of sixty days either by being continuously disabled "due to the same cause," or "by combining separate periods of continuous disability, due to the same cause, which occur[red] in a period of time lasting not longer than [120 days]," with each such period lasting at least thirty days, except for the last when fewer than thirty days were required to reach the requisite sixty-day elimination period. ECF No. 35-2 at 3, 5.  Income benefits were payable starting the first "day after the end of the elimination period." *Id.* at 5.

Under the terms of the policy, total disability was the loss of ability to "do any substantial and material duties to [the

Insured's] regular job." *Id.* The Policy defined regular job as "the occupation in which the Insured is engaged when a disability starts." *Id.* Additionally, total disability included the "total loss of one or more of the following, without regard to the Insured's ability to work:

> (a) the sight of both eyes;
>
> (b) the use of both hands, both feet, or one hand and one foot;
>
> (c) speech; or
>
> (d) hearing in both ears."

*Id.*

In addition to total disability, the Policy included a residual disability rider ("Rider") dated March 9, 1988. *Id.* at 35-2. "A rider . . . is a writing added or attached to a policy . . . which expands or restricts its benefits or excludes certain conditions from coverage." 2 Couch on Insurance § 18:19 (3d ed., Westlaw updated Nov. 2014). Under the terms of the Rider, residual disability meant "a loss of income . . . of at least 20%" and that loss had to "result, directly and apart from any other cause, from" a covered disability. ECF No. 35-2 at 14.

The claims process is outlined in the Policy and modified in the Rider. *See id.* at 7, 13. The process required the Insured to file a "written notice of claim" to the Insurer. *Id.* at 7. The notice of claim was to "be given within 30 days after a disability starts or a covered loss occurs, or as soon as . . . c[ould] be reasonably done." *Id.* After the Insurer received the notice of claim, claims forms were to be "sent to the claimant to be filled out and returned." *Id.* at 13 (deleting the "Claims Forms provision" in the Policy and replacing it with the "Claims Forms provision" in the Rider). If those forms did not arrive "within 10 working days after giving a notice of claim," the Insured could "instead give a complete written account of the facts that" the Insurer needed to determine the claimants' eligibility for benefits. *See id.*

In addition to the claim notice, the Policy required written proof of disability or loss "within 90 days after a period of disability ends or within 90 days after a loss." *Id.* at 7. "Subject to proof of loss," the Insurer was to make payment for covered disabilities "not later than every 30 days during the period of liability and any amount due at the end of this period immediately upon receipt of the proof [it] need[ed]." *Id.* at 13 (deleting the "Time of Payment of Claim" provision in the Policy and replacing it with the "Time of Payment of Claim" provision in the Rider). Although the Policy did not define "period of disability," the Policy's terms show that a period of disability lasted so long as any given disability for which monthly income benefits were paid persisted. *See id.* at 6 ("If the Insured recovers from a disability for which monthly income benefits were paid, any later disability will be treated as a new period of disability . . . ."). The Policy also limited legal actions regarding claims. Claimants were not permitted to take any legal action against the Insurer "during the 60 days after receipt of written proof, or after 3 years from the date proof [was] required to be given." *Id.* at 7.

### c. Construction of the Policy

Though the Policy mostly is clear, the Court turns now to the more ambiguous terms. Specifically, the Court addresses the parties' clash over construction of the Proof of Loss provision and the Legal Actions provision.

### 1. Proof of Loss

Under the terms of the Policy, it is not clear when proof of loss was required so that the claim was payable from the Insurer to the Insured. Defendants state without citation that "'a period of disability' is a period of a month." ECF No. 35-17 at 12. Therefore, so the argument goes, the proof of loss provision obligated claimants "to submit proof of loss within 90 days of the end of any period (*e.g.*, month) for which [they were] claiming benefits." *Id.* at 13 (alteration in original) (quotation omitted).

Though not exceedingly clear, Royal appears to argue that by the terms of the policy a period of disability does not end until the insured recovers from a claimed disability. *See* ECF No. 43 at 7. Therefore, because Royal did not recover "within the Policy term which only ran 'to age 65,'" no proof of loss was due to the Insurer until ninety days after Royal's sixty-fifth birthday when the period of disability ended. *See id.* at 7. In this way, according to Royal, "the only commonsense interpretation of the" proof of loss requirement "is that it affords a legal basis for Defendants to recover payments made to a claimant 'after a period of disability ends' but before receiving notice thereof." *Id.*

Both parties' interpretations miss the mark. Part of Royal's misconception of the proof of loss requirement of the Policy likely is from his contention that the provisions in the Rider provide separate coverage for residual disability, as opposed to supplementing the Policy. *See* ECF Nos. 43 at 8 ("[T]he Residual Disability Rider provides entirely separate and distinct coverage *in addition to* the total disability coverage provided by the basic policy."); 43-3 at 6 ("[T]he Residual Disability Rider does *not* 'supplement' the 'Proof of Disability or Loss provision' of the Policy, but provides entirely separate and distinct coverage *in addition to* the total disability coverage provided by the basic policy."). Both the plain language of the Rider and basic principles of insurance contracts bely Royal's understanding of the effect of the Rider. First of all, the Proof of Loss provision in the Rider specifically states that it is "added to the Proof of Loss provision in the Claims Section." ECF No. 35-2 at 16. Second, provisions in riders are "part of the contract to the same extent as if [the Rider] were actually embodied [in the Policy]." 2 Couch on Insurance § 18:19 (3d ed., Westlaw updated Nov. 2014). The Rider and the Policy plainly are not separate contracts, but rather "the [P]olicy and the [R]ider . . . together constitute the contract of insurance and are to be read together to determine the contract actually intended by the parties." *Id.* (footnote omitted).

As for Defendants' interpretation, it appears as though they contend that the Rider's Time of Payment provision, requiring payment for covered disabilities every thirty days, subject to proof of loss, altered the period of disability provision in the Policy. ECF No. 35-17 at 12-13.

12

However, there is nothing on the face of the Policy that suggests the Rider's Time of Payment provision affected the Policy's definition of a period of disability, which is the period of time "a disability for which monthly income benefits were paid" persists. *See* ECF No. 35-2 at 6.

The parties' confusion over the effect of the Rider's Time of Payment and Proof of Loss provisions on the Policy is understandable. Indeed, the Eleventh Circuit considering similar language has concluded that such time of payment provisions conditioned on proof of loss are ambiguous "and could fairly be interpreted to mean that written proof of loss is indeed required" to be provided on a regular basis after the end of monthly benefit terms. *See Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 885 (11th Cir. 2001). The Court agrees that the Rider's Time of Payment provision is ambiguous. Accordingly, the Court turns to Georgia's rules of contract construction to resolve the ambiguity. *See Pastoria*, 584 S.E.2d at 43.

Georgia law requires that courts "favor that construction which upholds the contract in whole and in every part, and that [courts] look at the whole contract in arriving at the construction of any part." *RLI Ins.*, 635 S.E.2d at 171-72 (citing O.C.G.A. § 13-2-2(4)). In doing so, courts "avoid any construction that renders portions of the contract language meaningless." *Id.* at 172. Additionally, "[i]f the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." O.C.G.A. § 13-2-2(5). In the context of insurance contracts, ambiguities

are construed liberally in favor of the insured. *State Farm Mut. Automobile Ins. Co. v. Staton*, 685 S.E.2d 263, 265 (Ga. 2009).

Viewing the claims provision as a whole, it is clear that there were two prerequisites for payment under the Policy. First, the Insured had to provide written notice of claim. ECF No. 35-2 at 7. Second, the Insured had to provide written proof of loss within ninety days after the claimed period of disability ended, or within ninety days after a loss occurs. *Id.* The Insured was excused from providing written proof of loss, however, only if: (1) it was not "reasonably possible to give the proof within that time"; (2) proof was "given as soon as reasonably possible"; and (3) the proof had to "be given within one year from the time that proof [was] otherwise required . . . ." *Id.* It is also clear that claims under the Policy were not payable until "all information that [was] necessary for [the Insurer] to make a decision [was] received." *Id.* To facilitate this process, the Insured was to submit claim forms, which the Insurer was to send to the Insured after receiving the notice of claim. *Id.* If the Insured did not receive the claim forms, "he or she [could] instead give a complete written account of the facts that [the Insurer] need[ed]" to make a determination. *Id.*

The Rider modified the claims provision of the Policy. *See id.* at 13 (Modification of Policy Provisions). Importantly, the Rider deleted the Policy's Time of Payment of provision and provided instead, that *subject to proof of loss*, payment was to "be made not later than every 30 days during the period of liability and any amount due at the

end of th[at] period immediately upon receipt of the proof [the Insurer] need[ed]" to make a determination." *Id.* The Rider also added provisions to the Claims Section. *See id.* at 15 ("The following is added to the Claims Section."). Under the additional sections, any claim based on a misstatement of income was to "be adjusted to reflect the correct amount" with any adjustment including "interest, at 6% per year, compounded each year, from the date of the wrong payment to the date the adjustment was made." *Id.* at 16. Also, during the course of administration of a claim, the Insurer reserved "the right to have the Insured's financial records audited by independent auditors . . . as often as reasonably required." *Id.* Finally, the Rider added to the Proof of Loss provision authorization for the Insurer to "require, as part of the proof of loss of income, the Insured's income statements, copies of income tax returns, audit reports, payroll records, accountant's statements, and any other financial records which contain facts [the Insurer] need[ed]" to make a determination. *Id.*

When the Policy and the Rider are read together, as they must be, *see* 2 Couch on Insurance § 18:19 (3d ed., Westlaw updated Nov. 2014), the Policy's claims section provided for periodic benefits, payable every thirty days during a period of disability. However, payment at these intervals was subject to proof of loss. Thus, no claim for benefits for any thirty-day period was payable until and unless the Insurer had the information necessary to make a decision regarding entitlement to disability pay for that period. Accordingly, although under

the terms of the Policy without the Rider, no written proof of loss was due until ninety days after a period of disability ended or within ninety days after a loss occurred, in order to give effect to the periodic payment of benefits provided for in the Rider, it is evident that proof of loss was due earlier than after the period of disability ended and more regularly than a one-time submission.

Royal's position, though convoluted, appears to be that payment of claims under the Policy required a sort of bookending proof of loss—i.e., a submission of an Application for Benefits at the beginning of a period of disability and a written proof of loss after the period of disability ended. *See* ECF Nos. 43 at 7 (citing ECF No. 35-4); 43-3 at 4. The Court deduces that Royal intended to argue that the initial proof of loss required for payment of a claim was the initial claim, ECF No. 35-3. This submission, according to Royal, triggered a right to payment under the Policy and the only further proof of loss for a claim needed was the written proof of loss due after the period disability ended.

Under the unmodified Policy, this interpretation is conceivable. The time of payment of claim originally was when "all information . . . necessary for [the Insurer] to make a decision [was] received." ECF No. 35-2. But the unmodified Policy did not provide for regular, periodic payments during the disability period, but rather provided only for retroactive reimbursement for periods of disability. Thus, it is not evident that the Insured would have had any right to payment until the Insured had complied with both the Notice of Claim and the Proof of Loss provisions under the

14

claims section. The Rider, however, modified the Policy provide for periodic payments "subject to proof of loss." ECF No. 35-2 at 13, ¶ 2 (replacing the "Time of Payment of Claim provision").

Although the Rider provided for more regular payments during the disability period, no payment was due under the Policy unless and until the Insurer received proof of loss. And an initial claim is not necessarily, in itself, sufficient proof of loss under the policy. To interpret the Policy so that a notice of claim alone satisfied the proof of loss requirement would effectively render the Proof of Disability or Loss provision superfluous, as the time requirements under the Proof of Loss provision would be meaningless as sufficient written proof would have already been submitted within thirty days after the disability started. Such a result is disfavored under the rules of construction. *See Thornton v. Kumar*, 525 S.E.2d 735, 736 (Ga. Ct. App. 1999) ("The law favors a construction that will uphold the contract as a whole . . . .").

Further, if the claim forms were sufficient to satisfy the written proof required for proof of loss, surely the contract would have used the words "claim forms" or "claim" again under the Proof of Disability or Loss provision. *See Jordan v. Smith*, 596 F. Supp. 1295, 1302 (N.D. Ga. 1984) (applying Georgia law). Indeed, the Rider shows that something more than claims forms was contemplated under the Proof of Loss provision—e.g., "the Insured's income statements, copies of income tax returns, audit reports, payroll records, accountant's statements and any other financial records

which contain the facts [the Insurer] need[ed]." ECF No. 35-2 at 16. To be sure, Royal's own practice shows that he was aware that something more than claim forms alone were required for proof of loss. For example "[f]rom March 2004 through September 18, 2006, . . . Royal periodically submitted proof of loss to Paul Revere in support of his claim for benefits." ECF No. 35-1 at 5 (Affidavit of Glenda Alin, Lead Disability Benefits Specialist at Unum Group). In addition to Supplemental Claimant Statements, Royal's proof of loss on those occasions included medical information, occupational information, and financial information regarding Royal's income. *Id.* at 6.

This interpretation of the Policy makes practical sense as well. Insurance providing for periodic benefits simply cannot work under Royal's construction of the Policy— i.e., by paying an initial claimed period, the Insurer is obligated to pay subsequent periods without further proof of loss. *See* ECF No. 43 at 8. Insurers rely on insureds to provide "[s]ufficient and accurate proof that a loss occurred under circumstances establishing that the loss is covered by the policy" and "[s]ufficient and accurate proof of the amount of the loss." 13 Couch on Insurance § 186:1 (3d ed., Westlaw updated Nov. 2014). Such proof of loss "is necessary to process the claim, protect against fraud, and minimize losses . . . ." *Id.*; *see also Lee v. Prudential Ins. Co.*, 812 F.2d 1344, 1346 (11th Cir. 1987) ("The purpose of requiring such proof of loss is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to

prevent fraud."). Without proof of loss for any given claimed payment period, the insurer is unable to investigate the claim and is unable to "form an intelligent estimate of its rights and liabilities." 13 Couch on Insurance § 186:22 (3d ed., Westlaw updated Nov. 2014). Therefore, absent proof of loss, insurers are not obliged to pay. *Id.* When an insurer commits to making periodic payments while administering a claim, it can only make those payments if insureds submits regular proof of loss.

Applied to the Policy, then, in order for Royal to be entitled to payment for any given thirty-day period during the claimed period of disability, he would have had to submit proof of loss reflecting the amount of loss for that period. Without such proof, the insurer simply would be unable to accurately calculate the amount of benefits due for the claimed period and would therefore not be obligated to pay any benefits.

Accordingly, the Court finds that the Policy obligated Royal to submit regular, periodic proof of loss in order to be entitled to the periodic payments provided for in the Policy. Further, because each thirty-day period claimed represents a claimed loss, the Court finds that the provision requiring proof of loss be submitted within ninety days after a loss occurs dictates that proof of loss for periodic benefits was due within ninety days of the end of any thirty-day period for which Royal sought periodic payment under the Policy.

To be sure, it could be argued that the language in the Proof of Disability or Loss provision "is susceptible to two or more constructions" and should therefore "be construed strictly against the insurer and in favor of the insured." *See Am. S. Ins. Co. v. Golden*, 373 S.E.2d 652, 653 (Ga. Ct. App. 1988). But the Proof of Disability or Loss provision simply is not susceptible to two or more constructions here. Viewed in isolation, the provision provides two options for submitting written proof—i.e., ninety days after the end of a period of disability or ninety days after a loss occurs. The Rider however, provides for periodic payments, subject to proof of loss, before the end of a disability period. Royal is claiming entitlement to unpaid periodic payments. The only reasonable construction of the Proof of Disability or Loss provision that gives effect to the periodic payments provision is that proof was due within ninety days after any claimed thirty-day loss period. *See Ga. Farm Bureau Mutual Ins. Co. v. Gaster*, 546 S.E.2d 30, 31 (Ga. Ct. App. 2001) (stating that in construing a contract "[t]he contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others").

## 2. Legal Actions Provision

The Legal Actions provision of the Policy states: "With respect to any claim under this policy, no legal action may be taken against [the Insurer] during the 60 days after the receipt of written proof, or after 3 years from the date proof is required to be given." ECF No. 35-2 at 7. Defendants contend that the Legal Actions provision thus bars suit on any claim for which proof of loss was due before November 3, 2007—three years before the

day Royal filed this action. ECF No. 35-7 at 17.

Royal counters, arguing that "the three-year provision relates solely to the initial filing of a new claim—a one shot provision." ECF No. 43 at 10. That is, according to Royal the "plain language" of the Legal Actions provision "requires an insured who should have given notice of a *new* claim but failed to do so to bring suit within three years from *the date proof is required to be given*." *Id.* Because Royal filed his notice of claim, so his argument goes, the Legal Actions "provision has *no* application to *existing* claims which are governed by the statute of limitation for contracts, and thus no applicability to this action." *Id.*

A review of the Policy and the caselaw on point reveals that this dispute between the parties is a false controversy. As an initial matter, the "plain language" of the Legal Actions provision is not limited to new claims, as Royal contends. Rather, the Legal Actions provision applies to "*any* claim under th[e] Policy." *See* ECF No. 35-2 at 7 (emphasis added). To be sure, the Policy specifies that the time for bringing legal action begins to run not when notice of claim was due, but rather from "the date proof [was] required to be given." *Id.* Surely, if the parties intended the period to begin to run on the date notice of claim was to be given, they would have used the words "notice of claim," rather than "proof." *See Jordan*, 596 F. Supp. at 1302. They did not. The Policy specifies that the three-year limitations period runs from the date proof of loss is due, such limitations provisions are "valid and binding." *See Smith v. Allstate*

*Ins. Co.*, 285 S.E.2d 82, 84 (Ga. Ct. App. 1981).

Royal's argument that legal actions regarding "*existing* claims . . . are governed by the statute of limitation for contracts," ECF No. 43 at 10, is unavailing. Unsurprisingly, Royal cites no authority for this sweeping assertion. The Court's own search for such authority in Georgia proved futile. The Court of Appeals of Georgia has stated the importance of contractual time limitations in the context of insurance:

> Such contractual limitation provisions serve to eliminate the insurer's possible protracted exposure to suit. Absent such provisions, that exposure would extend throughout the contractual limitation period [for contracts], for six years after losses. The public interest is served by permitting the insurer to limit the time of its exposure. Because the insurer's reserves must be sufficient to meet the possible losses, a shorter period of exposure results in lower premiums for insureds. At the same time, the rights of insureds are not impaired, because a [three-year] limitation is reasonable.

*Ga. Mut. Ins. Co. v. Glennville Bank & Trust Co.*, 494 S.E.2d 103, 105 (Ga. Ct. App. 1997) (citation omitted) (upholding a one-year limitation period).

Indeed, Georgia law requires that sickness and accident insurance policies include a three-year limitations period, as opposed to O.C.G.A. § 9-3-24's default six-year limitations period for actions upon simple written contracts. *See* O.C.G.A. 33-29-3(11) (required Legal Action policy

provision). Accordingly, the Court finds that the Policy's Legal Actions provision bars suit upon any claim for which proof of loss was due more than three years before November 2, 2010, the day before Royal filed this lawsuit.

### d. Merits of Defendants' Motion

With the construction of the Policy in mind, the Court now turns to the merits of Defendants' motion for summary judgment. Royal's suit seeks recovery of residual disability benefits from April 1, 2006, through March of 2012, when Royal turned sixty-five and the Policy terminated. *See* ECF Nos. 1-1 at 5; 35-17 at 2; 36 at 66. Thus, at a minimum, in order to be entitled to those claimed benefits, Royal must have submitted proof of loss for each thirty-day claimed period of disability and must have complied with the Legal Actions provision of the Policy.

### 1. The Legal Actions Provision Bars Some of Royal's Claims for Benefits

As explained more fully above, the Policy contains a Legal Actions provision which prohibits suit regarding any claim "during the 60 days after receipt of the written proof" and "after 3 years from the date proof is required to be given." *See* ECF 35-2 at 7. Royal filed this action on November 3, 2010. ECF No. 1-1 at 2. Thus, the legal actions provision bars any claim for benefits for which proof of loss was due more than three years before November 2, 2010.

Legal actions provisions not only are "valid and binding" in Georgia, *Smith*, 285 S.E.2d at 84, but also are statutorily required in sickness and accident insurance policies, O.C.G.A. 33-29-3(11) (required Legal Action policy provision); *see also Hemeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 614 & n.5 (2013) ("[T]he vast majority of States require certain insurance policies to include 3-year limitations periods that run from the date proof of loss is due." (citing O.C.G.A. § 33-29-3(b)(11) along with forty-one other states' statutes). Royal argues, however, that the Legal Actions provision's "plain language requires an insured who should have given notice of a new claim but failed to do so to bring suit within three years from the date proof is required to be given." ECF No. 43 at 10. In doing so, Royal conflates a notice of claim with the written proof required for payment of a claim. The Legal Actions provision plainly sets the trigger for the contractual limitation periods as "receipt of the written proof" or "the date proof is required to be given." ECF No. 35-2 at 7. As explained above, notice of claim is different than "written proof" and "proof." The Legal Actions provision gilds the Court's lily on this matter. If a notice of claim was synonymous with "written proof" or "proof," the parties surely would have used the term "notice of claim" as the trigger for the contractual limitation's period. The only alternative is that the Notice of Claim provision and the Proof of Disability or Loss provisions are synonymous and one is superfluous. The Court will not substitute its own words for the words the parties chose and also will not read the Legal

Actions provision so as to render other provisions in the Policy superfluous. *See NW Parkway, LLC v. Lemser*, 709 S.E.2d 858, 861 (Ga. Ct. App. 2011). Therefore, the Court finds that the date on which proof of loss was due triggered the running of the Policy's contractual limitations period.

Also explained above, the Proof of Disability or Loss provision allows proof of loss either to be submitted "within 90 days after a period of disability ends or within 90 days after a loss occurs." ECF No. 35-2 at 7. The Rider, however, provides for payments, subject to proof of loss, every thirty days throughout any given disability period, or at the end of a period of disability "immediately upon receipt of the proof . . . need[ed]." ECF No. 35-2 at 13. Thus, the Insurer could be required to make periodic payments during the claimed disability payment, or could be required only to make a payment reimbursing the Insured after the claimed period of disability ended.

It is clear that Royal is claiming payment of periodic residual disability benefits. Indeed, he filed suit seeking payment before his period of disability ended, *see* ECF No. 43 at 7 ("Royal's 'period of disability' did *not* end within the Policy term which only ran 'to age 65' . . . .). Therefore, considering the Policy "as a whole," giving "each provision . . . effect," and interpreting those provisions "so as to harmonize with the others," *see Gaster*, 546 S.E.2d at 31, the Court finds that each thirty-day payment period available under the Policy constitutes a period of loss for which proof was required to be given within days after it occurred—i.e., within ninety days of the end of each thirty-day period.

Under this interpretation, the Policy's Legal Actions provision bars Royal's claims for monthly benefits from April 1, 2006, to August 4, 2007. Royal filed suit on November 3, 2010. ECF No. 1-1. Thus, the Legal Actions provision bars all claims for which proof of loss was due more than three years before that date. Proof of loss for a period ending on August 5, 2007, would have been due on November 3, 2007. Therefore, Defendants are entitled to summary judgment on claims for monthly benefits for April 2006 through July 2007.

## 2. Proof of Loss Provision Bars Royal's Remaining Claims

The parties have spilt much ink disputing whether or not Royal can prove that the losses he sustained from April 1, 2006, through March 2012, satisfy the Policy's loss requirements for residual disability benefits—i.e., "a loss of income . . . of at least 20%" that resulted "directly and apart from any other cause, from an injury or a sickness, as defined in this policy," ECF No. 35-2 at 14. *See* ECF Nos. 35-17 at 6-11; 43 at 4-6; 50 at 7-14. However, this argument is all for naught unless Royal complied with the Policy's Proof of Disability or Loss provision.

Under the Policy, payment of claims was subject to proof of loss. ECF No. 35-2 at 13. Thus, the Policy unambiguously conditions payment of claims on the receipt of proof of loss and, "[a]bsent a waiver, the furnishing of the proof of loss as required by the policy is a condition precedent to the accrual of liability on the part of the [insurer] and to the institution of suit by the

insured." *Buffalo Ins. Co. v. Star Photo Finishing Co.*, 172 S.E.2d 159, 166 (Ga. Ct. App. 1969). To be sure, payment of benefits without requiring compliance with proof of loss provisions can result in waiver of the proof of loss condition and prevent an insurer from raising an insured's failure to submit proof of loss as a defense. *See New York Underwriters Ins. Co. v. Noles*, 115 S.E.2d 474, 476-77 (Ga. Ct. App. 1960). But there is nothing to indicate waiver here.

Royal argues that compliance with the Proof of Loss provision is a non-issue because Defendants accepted Royal's initial claim and made monthly payments pursuant to that claim. *See* ECF No. 43 at 7. In doing so, Royal attempts to tell the Court that payments under the Policy were made pursuant to only one proof of loss—i.e., Royal's initial claim. *See id.* at 7 ("Defendants commenced payment of benefits to Plaintiffs and continued to pay disability income benefits . . . on the basis of the *only* proof of loss which Royal submitted—the Application for Benefits . . . ."). In so arguing Royal cites, perhaps inadvertently, to an exhibit attached to Defendants' motion for summary judgment containing sixteen supplemental statements that Royal submitted periodically over the course of over two years. *See* ECF No. 35-4.

The unrefuted evidence in the record squarely contradicts Royal's contention that Defendants paid benefits without requiring continued proof of loss. "Royal submitted proof of loss seven times in 2004, fourteen times in 2005, and six times in 2006—the last time on September 18, 2006." ECF No. 35-1 at 6 (Affidavit of Glenda Alin, Lead Disability Benefits Specialist at Unum Group). This proof was not limited to supplemental claimant statements, but rather "almost always included financial information regarding whether, and to what extent, Mr. Royal had sustained a loss of income in the preceding few months." *Id.* Indeed, in his deposition Royal testified that he knew that Paul Revere relied on continued proof of loss in administering his claim for monthly benefits. ECF No. 36 at 70 (Deposition of Luther W. Royal).

Accordingly, finding no evidence supporting a waiver of the proof of loss requirement, the Court finds that compliance with the proof of loss is a condition precedent to Defendants' liability under the Policy. Royal admits, and the record confirms, he last submitted proof of loss to Paul Revere in September of 2006. *See id.* at 70; ECF Nos. 35-1 at 6; 35-4 at 18.

But, as explained above, claims requiring submission of proof of loss in 2006 undoubtedly are time-barred under the Legal Actions provision of the Policy. And, at the time Royal instituted this suit he had submitted no further proof of loss to Paul Revere in support of his claims, strongly indicating that Paul Revere was under no obligation to pay Royal benefits for periods after September 2006. Royal argues, however, that Paul Revere was under an affirmative obligation to request further information by sending Claimant Supplemental Statements to be filled out and returned and, absent such requests, any initial determination of entitlement to benefits persisted "unabated until the insured ha[d] fully recovered." *See* ECF No. 43. This argument is unsupported.

First of all, under the Policy, the Insurer was to send claim forms to the Insured after receiving a notice of claim. *See* ECF No. 35-2 at 13. If, however, those forms did not arrive, the Insured could "instead give a complete written account of the facts" the Insurer needed to make a determination of eligibility. *Id.* Nothing in the claims forms provision excused Royal from his clear obligation of providing written proof of loss or from the condition precedent to payment of a claim.

Second, the idea that making an initial disability determination obligates the insurer to pay disability benefits continuously, with no further proof, until the insured fully recovers is nonsensical. Without proof of loss, the insurer is unable to make any intelligent determination as to the size of benefit to which the insured is entitled, or to whether the insured is entitled to a benefit at all. *See* 13 Couch on Insurance § 186:22 (3d ed., Westlaw updated Nov. 2014). This is especially true when insureds claim month-to-month, periodic benefits. Indeed, Royal admits "determination of eligibility for residual income benefits" occurs "on a month-to-month basis." ECF No. 43 at 5. This invites the question, without continued proof of loss, how can an insurer make a benefit determination in light of income variations that fluctuation in the market occasions? The answer is: It cannot.

Finally, Paul Revere terminated Royal's claim on October 31, 2006. *See* ECF No. 35-8 ("Termination Letter"). The Termination Letter advised Royal that he had until November 6, 2006, to contest the termination of benefits and, if he did not, Paul Revere would "conclude that [he did]

not dispute" the termination. *See id.* at 11. Royal admits that he received the Termination Letter, *see* ECF No. 36-1 at 43-44 (Deposition of Luther W. Royal), but he did not respond to the letter until April 26, 2007. *See* ECF No. 35-9 at 2 (Letter from Mr. William J. Neville, Jr., to Ms. Glenda Alin, Senior Disability Benefit Specialist, The Paul Revere Life Insurance Company).[5] Even this appeal letter, however, provided Paul Revere with no further proof of loss, but rather relied on the "voluminous documentation which [Royal] ha[d] already furnished . . . ." *See id.* Although both Royal and his counsel dispute that they received anything in response to their appeal, *see* ECF No. 36-1 at 46 (Deposition of Luther W. Royal) (denying receipt of letter denying the appeal), it is undisputed that Royal submitted no further proof of loss after September 2006.

Thus, Royal had notice that Paul Revere had closed his claim effective October 31, 2006. *See* ECF No. 35-8. Yet he did not submit a further notice of claim or further proof of loss to Paul Revere. Rather, in his appeal he simply relied on previously submitted proof of loss, which provided Paul Revere no notice that he claimed entitlement to benefits beyond the proof submitted in September 2006. Indeed, Paul Revere had no information regarding Royal's claimed losses until February 3, 2014, when Royal first produced financial information in response to Defendants' request for production of documents. *See*

[5] This letter references a November 10, 2006, letter. *See* ECF No. 35-10 at 2. But there is no such letter in the record, nor does Royal have any knowledge of a November 10, 2006, letter. *See* ECF No. 36-1 at 45 (Deposition of Luther W. Royal).

ECF No. 35-14 at 3 (Affidavit of H. Sanders Carter, Jr., Attorney for Defendants). Nonetheless, Royal claims that Paul Revere was obligated to continue paying benefits pursuant to a closed claim such that money would fall unto him like manna from heaven. This simply is not the case.

Paul Revere was not obligated to pay any purported claim Royal had unless and until he submitted proof of loss. Similarly, Royal cannot recover for benefits allegedly owed absent a showing that he complied with proof of loss requirement which was clearly a condition precedent to payment under the Policy. *Buffalo Ins. Co.*, 172 S.E.2d at 166. The evidence clearly shows that Royal has not submitted proof of loss to Paul Revere since September 2006. Royal does not dispute this fact. Therefore, Defendants are entitled to summary judgment regarding all claims for benefits from September 2006 through March 2012.

### 3. Royal's Bad Faith Claim

In addition to his claims to unpaid benefits, Royal also seeks penalties under O.C.G.A. § 33-4-6 for Defendants' allegedly bad faith refusal to pay his claim. *See* ECF No. 1-1 at 6. Under O.C.G.A. § 33-4-6, insureds can recover, "in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees," if the insured can prove that the insurer has refused to pay for a covered loss in bad faith. *See* O.C.G.A. § 33-4-6(a).

"In order to prevail on a claim for an insurer's bad faith, the insured must prove two conditions: (1) that a demand for payment was lodged against the insurer at

least 60 days prior to filing suit and (2) that the insurer's failure to pay was motivated by bad faith." *Primerica Life Ins. Co. v. Humfleet*, 458 S.E.2d 908, 910 (Ga. Ct. App. 1995). Here, although Royal alleged in his Complaint that more than sixty days had elapsed since he made written demand upon Defendants for payment, ECF No. 1-1 at 5, the evidence reveals no such written demand for payment. Rather, the most recent correspondence from Royal to Paul Revere was Royal's appeal of his termination of benefits, dated April 26, 2007. *See* ECF No. 35-9 at 2. Construing this appeal as a "demand for payment" as required under O.C.G.A. § 33-4-6, Royal's bad faith claim accrued on June 25, 2007, upon the passing of sixty days from the date of the written demand for payment. Thus, it is clear that the Policy's three-year limitations period bars Royal's bad faith claim.

Even though O.C.G.A. § 33-4-6 is a statutory cause of action, the right claimed evolves from a written insurance contract and, therefore, "regardless of the form of the action, . . . the limitations contained in [the Policy] supersede any other general statutory limitations." *See Modern Carpet Indus., Inc. v. Factory Ins. Ass'n*, 186 S.E.2d 586, 587 (Ga. Ct. App. 1971); *see also cf. Cagle v. State Farm Fire & Cas. Co.*, 512 S.E.2d 717, 718-19 (Ga. Ct. App. 1999) (recognizing that a contractual limitation provision limits the time in which an insured can bring an action under O.C.G.A. § 33-4-6).

The Court knows not why Royal was not "aroused to action" until over three years after his potential bad faith cause of action accrued. *See Graham v. Niagara Fire Ins.*

*Co.*, 32 S.E. 579, 580 (Ga. 1899). It does know, however, that once Royal was spurred to action, the Policy's contractual limitation period had run on any claim Royal could advance under O.C.G.A. § 33-4-6 predicated on his construed demand for payment dated April 26, 2007. Therefore, Defendants are entitled to summary judgment on Royal's bad faith claim.

### D. Royal's Motion for Summary Judgment

In response to Royal's Complaint seeking benefits allegedly due under the Policy, Paul Revere advanced a counterclaim alleging fraud and seeking $178,615.22 in compensatory damages, as well as punitive damages and attorney's fees. ECF No. 4 at 23. Royal and RCR filed a motion for summary judgment on this claim, arguing that Georgia's four-year statute of limitations under O.C.G.A. § 9-3-31 barred Paul Revere's counterclaim. ECF No. 37 at 1. Paul Revere responded, arguing that Georgia's tolling provision for fraud, O.C.G.A. § 9-3-96, and Georgia's tolling provision for torts arising from a crime, O.C.G.A. § 9-3-99, save its counterclaim from O.C.G.A. § 9-3-31's general statute of limitations for injuries to personalty. *See* ECF No. 42 at 1-2.

### 1. Standard of Review

"On motion for summary judgment based upon the running of the statute of limitation, 'the movant has only the burden of proof as to an affirmative defense of the running of the statute of limitation and not to establish the absence of facts showing a tolling.'" *Mayfield v. Heiman*, 730 S.E.2d 685, 691 (Ga. Ct. App. 2012) (quoting *Miller v. Kitchens*, 553 S.E.2d 300, 302 (Ga. Ct. App. 2001)). Once the movant has satisfied its burden, the burden of persuasion shifts to the nonmovant to come forth with some evidence of an issue regarding whether the statute has been tolled. *Id.* Paul Revere contends that a fact question exists as to whether its fraud counterclaim was tolled under Georgia's tolling provisions. *See* ECF No. 60 at 5. The Court agrees.

### 2. Georgia Tolling Provisions

In general, fraud claims under Georgia law are subject to a four-year statute of limitation. *See Majeed v. Randall*, 632 S.E.2d 413, 416 (Ga. Ct. App. 2006) (citing O.C.G.A. § 9-3-31). However, that statute of limitations period may be tolled where "the plaintiff has been debarred or deterred from bringing an action." O.C.G.A. § 9-3-96. In such situations, "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." *Id.* Additionally, for any tort "brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime committed in [Georgia]," the statute of limitations is "tolled from the date of the commission of the alleged crime or the act giving rise to such action in tort until the prosecution of such crime or act has become final or otherwise terminated, provided that such time does not exceed six years." O.C.G.A. § 9-3-99.

### 3. Application

In order to determine whether the statute of limitations bars Paul Revere's counterclaim, it must first be established when the limitations period began. *Contract*

*Furniture Refinishing & Maint. Corp. of Ga.
v. Remfg. & Design Grp., LLC*, 730 S.E.2d
708, 711 (Ga. Ct. App. 2012). This is so,
because the plain language of O.C.G.A. § 9-
3-99 dictates that the limitations period be
tolled as to a criminal defendant only while
a prosecution is pending. *See Valades v.
Uslu*, 689 S.E.2d 338, 342 (Ga. Ct. App.
2009). An indictment initiates the State's
prosecution of a criminal defendant. *See
Sellers v. State*, 587 S.E.2d 276, 277 (Ga.
Ct. App. 2003). Here, an Evans County
Grand Jury returned an indictment on July 1,
2010, charging Royal with fraud arising out
of the same facts and circumstances giving
rise to Paul Revere's counterclaim, *see* ECF
No. 37-1. As noted above, the statute of
limitations for cause of actions for injuries
to personalty is four years. O.C.G.A. § 9-3-
31. Thus, O.C.G.A. § 9-3-99's tolling
provisions apply here only if the statute of
limitations had not yet run on Paul Revere's
counterclaim on July 1, 2010.

### a.     O.C.G.A. § 9-3-96

A fraud action accrues upon an alleged
misrepresentation and a resulting loss. *See
Hamburger v. PFM Capital Mgmt., Inc.*,
649 S.E.2d 779, 784 (Ga. Ct. App. 2007)
("[B]ecause [the plaintiff] has not come
forward with evidence that the purported
misrepresentation and resulting losses
occurred less than four years before she filed
her complaint, her fraud claim is barred by
the statute of limitation unless she can show
that the statute was tolled."). Each alleged
misrepresentation and resulting damages
creates a new cause of action for that
specific act. *Cf. Godwin v. Mizpah Farms,
LLLP*, --- S.E.2d ----, 2014 WL 6536374, at
*6 (Ga. Ct. App. Nov. 21, 2014)

(considering the limitation period for breach
of fiduciary duty).

To toll the statute of limitations under
O.C.G.A. § 9-3-96, "Georgia law requires
proof of 'fraud by which the plaintiff has
been debarred or deterred from bringing an
action, [and] the period of limitation shall
run only from the time of the plaintiff's
discovery of the fraud.'" *Id.* at *7 (quoting
O.C.G.A. § 9-3-96). Fraud alone does not
toll the statute of limitations. *See Wilhelm v.
Houston Cnty.*, 713 S.E.2d 660, 663 (Ga. Ct.
App. 2011). Rather, in order to establish
"fraudulent concealment, a plaintiff must
prove:

> (1) actual fraud involving moral
> turpitude on the part of the defendant;
> (2) [that] the fraud conceal[ed] the
> existence of the cause of action from
> the plaintiff, thereby debarring or
> deterring the knowing of the cause of
> action; *and* (3) [that] plaintiff
> exercised reasonable diligence to
> discover the cause of action,
> notwithstanding the failure to discover
> within the statute of limitation.

*Godwin*, 2014 WL 6536374, at *7
(alterations in original) (quotation omitted).

Because this tolling provision is a
departure from the general rule, it requires
either actual fraud or a breach of a duty to
disclose arising out of a confidential
relationship. *See Tuttle v. Ga. Bd. of
Regents of Univ. Sys. of Ga.*, 756 S.E.2d
585, 588 (Ga. Ct. App. 2014) (citing *Trust
Co. Bank v. Union Circulation Co.*, 245
S.E.2d 297, 298 (Ga. 1978)).

> [T]hat actual fraud which will invoke
> the tolling provision of O.C.G.A. § 9-

3-36 arises in two different circumstances: 1) where the actual fraud is the gravamen of the action, and there is tolling until the fraud is discovered or by reasonable diligence should have been discovered and no other independent fraudulent act is required; and 2) where the gravamen of the action is other than actual fraud, in which case a separate independent actual fraud involving moral turpitude which debars and deters the plaintiff from bringing his action must be shown.

*Rai v. Reid*, 751 S.E.2d 821, 823 (Ga. 2013).

It is clear that actual fraud is the gravamen of Paul Revere's counterclaim. Therefore, the statute of limitations was tolled either until Paul Revere discovered Royal's alleged fraud, or should have discovered the fraud through reasonable diligence. *See id.* As such, Paul Revere argues that because it had no knowledge, actual or otherwise, of Royal's alleged fraud until "sometime between May 2006, when [it] received a call on its insurance fraud hotline . . . , and October 31, 2006, when [it] terminated the payment of additional benefits based on its investigation of the claim," the statute of limitations on its fraud counterclaim was tolled until sometime between May 2006 and October 31, 2006. ECF No. 42 at 7. Royal does not dispute this, but rather argues that Paul Revere failed to exercise reasonable diligence in discovering the fraud. ECF No. 51 at 9. In doing so, Royal contends that "[i]t is axiomatic that if [Paul Revere] had subjected the information in its possession to the same scrutiny all along which it purports

to have employed while" investigating the alleged fraud "it would have arrived at its same conclusions years earlier." *Id.* This certainly may be true, but misses the mark by a wide margin under O.C.G.A. § 9-3-96.

Reasonable diligence is, of course, a matter of reasonableness. Thus, what constitutes reasonable diligence under O.C.G.A. § 9-3-96 will vary depending upon the circumstances of the fraud and the relationship between involved parties, for that reason, reasonableness generally is a question for the jury. *Cf. Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980) ("'[R]easonable diligence' cannot be measured by a subjective standard, but, rather, must be measured by the 'prudent man' standard which is an objective one. . . . However, it is also true that it is for the jury to apply the unvarying standard of ordinary care to the facts and exigencies of each particular case . . . ." (internal quotation marks omitted) (third alteration in original) (quotation omitted)).

Importantly here, Paul Revere argues that the existence of a confidential relationship existed thus decreasing its duty to investigate. ECF No. 60 at 11-12. The existence of a confidential relationship

affects . . . the extent of (a) the defendant's duty to reveal fraud, and (b) the plaintiff's corresponding obligation to discover the fraud for herself. Where a confidential relationship exists, a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a

heightened duty to reveal fraud where it is known to exist.

*Godwin*, 2014 WL 6536374, at *8 (quotation omitted).

But in Georgia, the general rule is that no fiduciary or confidential "relationship exists between an insured and his or her insurer." *Monroe v. Bd. of Regents of Univ. Sys. of Ga.*, 602 S.E.2d 219, 222 (Ga. Ct. App. 2004). This is so despite the fact that insurers "repose[] great trust and confidence" in insureds to provide them with accurate information. *See Walsh v. Campbell*, 202 S.E.2d 657, 662 (Ga. Ct. App. 1973).

Nonetheless, the context of the relationship between insureds and insurers is a relevant consideration as to the reasonableness of Paul Revere's investigation of Royal's claims prior to receiving the fraud tip in May 2006. During both the application stage and the post-loss stage, there exists an information asymmetry between insureds and insurers, with insureds holding far superior access to the information insurers require to administer claims. Therefore, insurers must rely on insureds to provide accurate information regarding the losses they have sustained. *See* 13 Couch on Insurance § 186:1 (3d ed., Westlaw updated Nov. 2014). In providing this information, insureds clearly are under a duty to act in good faith. *See id.* § 186:19. While there is no talismanic requirement constituting "adequate proof of loss," what is adequate is that which "enable[s] the insurer to adequately focus its investigation and protect itself against fraud." *Id.* § 189:41.

With this context in mind, the Court turns to the evidence Paul Revere produced to show that the statute has been tolled. This evidence shows that, after Royal submitted his initial claim, representatives from Paul Revere conferred with him both by telephone and in person regarding his claim. ECF No. 42-2 at 7-8 (Affidavit of Glenda Alin, Lead Disability Benefits Specialist, Unum Group). In addition, during the administration of Royal's claim, from March 2004 through September 18, 2006, Paul Revere requested that Royal submit supplemental proofs of loss. *Id.* at 8. He did so on fifteen separate occasions. *Id.* at 9. Paul Revere also conducted its own investigation, requesting and obtaining medical records from five of Royal's physicians. *Id.* Paul Revere requested and received six separate Attending Physician Statements ("APS"), from October 2003 through October 2006. ECF Nos. 42-5 (initial APS); 42-8 (additional APS). During the administration of the claim, Royal also provided financial information from which Paul Revere could determine the amount of losses Royal allegedly sustained. ECF 42-2 at 11.

It was not until May 2006, when Paul Revere received a call on its fraud hotline, that Paul Revere increased its investigation, "which included surveillance of Mr. Royal and an audit of RCR's business records." *Id.* at 13. It was not until August 10, 2006, after two months of investigation, that Paul Revere had sufficient information to submit a Suspected Fraud Referral Form to the Office of Commissioner of Insurance regarding Royal's claims for benefits. *Id.* at 16; ECF No. 35-7 at 2 (Suspected Fraud

Referral Form). And it was not until October 31, 2006, after Paul Revere conducted an on-site audit of RCR, that Paul Revere had sufficient information to terminate Royal's claim. ECF No. 42-2 at 19-20.

On this evidence, Paul Revere's administration of Royal's claim simply does not exhibit a lack of diligence as a matter of law. *See Meyer v. Waite*, 606 S.E.2d 16, 20 (Ga. Ct. App. 2004) ("One may fail to exercise due diligence as a matter of law." (quotation omitted); *contra Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1172 (11th Cir. 1997) ("Where the party complaining of fraud fails to exercise any due diligence to discover the truthfulness of representations, there is no jury question."). Quite obviously, as Paul Revere's investigation of the fraud tip shows, it could have investigated Royal's claims with more gusto during the administration of that claim. "But at a cost, and the question is whether the additional benefit in [investigation] would have exceeded that cost." *Cf. Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) (considering, at the summary judgment stage, reasonable precautions in keeping trade secrets). The Court "do[es] not suggest that the question can be answered with the same precision with which it can be posed, but neither can [it] say that no reasonable jury could find that [Paul Revere] had done enough" in investigating Royal's claim and proofs of loss *ex ante. Cf id.*

Though Royal seeks to avoid this result, arguing that all of the information from which Paul Revere was able to uncover Royal's alleged fraud was open and available to Paul Revere at all times during the administration of his claim, *see* ECF No. 51 at 2-3, the cases on which he relies for this argument are inapposite. Indeed, the common principle drawn from those cases is that where evidence of an alleged fraud is easily accessible, and the defendant does nothing to conceal it, tolling is improper.[6] The facts presented here are easily distinguishable. The information from which Paul Revere uncovered Royal's alleged fraud was not easily accessible, but rather was produced at the cost of a several-month-long investigation. Further, Royal concealed what Paul Revere's extensive investigation revealed through alleged misrepresentations in the proof of loss he submitted in support of his claim.

The Court finds that, in response to Royal's invocation of the statute of limitation defense, Paul Revere has come forth with sufficient evidence to create a

[6] Royal relies on both *Falagna v. Krischner & Venker, P.C.*, 648 S.E.2d 690 (Ga. Ct. App. 2007), and *Allmond v. Young*, 723 S.E.2d 691 (Ga. Ct. App. 2012), for the proposition that failure to disclose does not toll the statute of limitation for fraud where the information revealing the alleged fraud is open and available. ECF No. 51 at 2-3. But in *Allmond* the Court of Appeals of Georgia rejected the plaintiffs' invocation of O.C.G.A. § 9-3-96 however, not only because the plaintiffs were on notice of the potential fraud, but also because there was no evidence that defendant "took any specific action to prevent [the plaintiffs] from discovering [the defendant's fraudulent act], especially in light of the fact that the records" from which the plaintiffs could have discovered the fraud were publicly available. 723 S.E.2d at 693. Similarly, in *Falagna*, the Court of Appeals of Georgia found that tolling was improper, because the alleged fraud was discoverable by simply reading the bills that the defendant sent to the plaintiff, something plaintiff had failed to do. 648 S.E.2d at 693.

genuine issue of fact as to whether the statute of limitation had was tolled until somewhere between May 2006 and October 31, 2006. This finding, of course, does not eliminate the possibility that Paul Revere knew or reasonably should have known of Royal's alleged fraud prior to July 1, 2006, a possibility that would preclude the shelter of O.C.G.A. § 9-3-99's tolling provision as the statute of limitation on Paul Revere's counterclaim would have run prior to the commencement of Royal's criminal prosecution. The precise time when Paul Revere's knowledge arose, or should have arose, during the timeframe between May 2006 and October 31, 2006, however, is a matter for the trier of fact to determine.

### b.    O.C.G.A. § 9-3-99

Having found that Paul Revere has introduced sufficient evidence to create a fact issue as to whether the statute of limitations had run prior to the commencement of Royal's prosecution, the Court turns to the parties' dispute over the applicability of O.C.G.A. § 9-3-99. Royal argues that O.C.G.A. § 9-3-99's six-year limitations period began to run with each alleged misrepresentation submitted to Paul Revere. *See* ECF No. 51 at 15-16. Paul Revere filed its counterclaim on December 15, 2010. ECF No. 4. Thus, according to Royal's argument, even if O.C.G.A. § 9-3-99 applies, it bars any claim Paul Revere has that is predicated on an alleged misrepresentation that occurred before December 15, 2004.

Paul Revere, while agreeing with Royal's computation of the limitations period from the dates of the commission of the alleged crimes, *see* ECF No. 60 at 7-9, argues that it can recover for all of Royal's alleged misrepresentations because "the act giving rise" to Paul Revere's action was its discovery of Royal's fraud sometime between May 2006 and October 31, 2006. *See* ECF Nos. 42 at 8; 60 at 9.

Although Georgia courts have not yet confronted this issue in interpreting this relatively young statute, the Court finds that canons of statutory interpretation allow it to reach the "principled rather than conjectural conclusion," *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 274-75 (5th Cir. 1976) (setting out factors for courts to consider in determining whether to certify questions to state courts), that Georgia courts would resolve the parties' dispute by reading "the act giving rise to" Paul Revere's action in tort as Paul Revere's discovery of Royal's alleged fraud. This is because despite the fact that Paul Revere's fraud claim accrued upon the alleged misrepresentation and resulting loss, Paul Revere could not bring suit until it knew, or should have known, that it had been defrauded.

Under O.C.G.A. § 9-3-99, "[t]he running of the period of limitations with respect to any cause of action in tort . . . shall be tolled from the date of the commission of the alleged crime *or* the act giving rise to such action in tort . . . ." O.C.G.A. § 9-3-99 (emphasis added). Fundamental rules of statutory interpretation require courts "to construe a statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage." *Slakman v. Continental Cas. Co.*, 587 S.E.2d 24, 26 (Ga. 2003); *see also Bhd. of*

*Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) ("To the extent possible, the rules of statutory construction require courts to give meaning to every word and clause in a statute. Additionally, courts must reject statutory interpretations that would render portions of a statute surplusage." (citations omitted)).

To interpret O.C.G.A. § 9-3-99 to mean that only the commission of the alleged crime triggers its six-year limitations period would be to read "or the act giving rise to such action in tort" out of the statute. This the Court will not do. Rather, although O.C.G.A. § 9-3-99's later reference to "prosecution of such crime or act" renders the statute's language slightly ambiguous, the Court reads the statute's reference to "the act giving rise to such action in tort" as being different than "the commission of the alleged crime."

It makes good sense, too, that O.C.G.A. § 9-3-99's six-year limitations period does not begin to run until the victim is able to bring suit. In many cases, that date will coincide with the commission of the alleged crime. In others, it will not. For example, if a minor suffers a tort as a result of an alleged crime, the running of the statute of limitations is suspended until the minor reaches the age of majority. *See* O.C.G.A. § 9-3-90(a); *see also M.H.D. v. Westminster Schs.*, 172 F.3d 797, 804 (11th Cir. 1999) (considering Georgia law and finding in a tort action that "the statute of limitations [was] tolled until the plaintiff reache[d] the age of majority"). If, however, O.C.G.A. § 9-3-99 is interpreted so as to bar any action

beyond six years from the date of the commission of the alleged crime, a ten-year-old victim would be forever barred from instituting a tort action against the alleged tortfeasor if that tortfeasor also is prosecuted. On the other hand, if the alleged tortfeasor is not prosecuted, that same ten-year-old victim would be able to bring an action in tort ten years from the date of the alleged tort (i.e., O.C.G.A. § 9-3-33's two-year limitations period for injuries to the person would not run until two years after the victim turned eighteen).

Similarly, if an alleged fraudster is prosecuted, he or she would be immune from suit if the victim does not discover the fraud within six years of the commission of the alleged crime, but a victim would be able to bring suit against an alleged fraudster who is not prosecuted beyond six years from the date of the alleged crime, so long as the victim does so within four years of when he or she discovered, or reasonably should have discovered, the alleged fraud. It is evident that interpreting O.C.G.A. § 9-3-99's six-year limitation period so as to produce such incongruous limitation periods based simply on whether or not a tortfeasor is prosecuted leads to absurd and unjust results in situations where, as here, the victim is unable to bring suit upon the commission of the alleged crime. The Court cannot interpret the statute to allow such a result. *See Gen. Elec. Credit Corp. v. Brooks*, 249 S.E.2d 596, 599 (Ga. 1978) ("It is the duty of the court to consider the results and consequences of any proposed construction and not so construe a statute that will result in unreasonable or absurd consequences not contemplated by the legislature." (quotation

omitted)); *see also Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 200 (1993) (recognizing "the common mandate of statutory construction to avoid absurd results").

Paul Revere's fraud claim accrued upon the alleged misrepresentation and resulting loss, but Paul Revere could not bring suit until it knew, or should have known, that it had been defrauded. Indeed, as already discussed, under O.C.G.A. § 9-3-96, the general limitations period runs only upon a victim's discovery of the fraud. Thus, the Court finds that the "act giving rise to" Paul Revere's tort action was its discovery of Royal's alleged fraud and therefore O.C.G.A. § 9-3-99's six-year limitations period did not begin to run until sometime between May 2006 and October 31, 2006.[7]

### c. Tolling as to RCR

RCR filed a separate reply to Paul Revere's response to Royal's motion for summary judgment. ECF No. 52. In this reply, RCR argues that O.C.G.A. § 9-3-99 is not applicable to toll limitations period for claims Paul Revere has against RCR arising out of Royal's alleged fraud. *Id.* at 2-3. RCR is correct as the Court of Appeals of Georgia has held that O.C.G.A. § 9-3-99 tolls the limitations period as to only the person accused of the alleged crimes that

also give rise to the victim's cause of action in tort. *See Mays v. Target Corp.,* 743 S.E.2d 603, 605 (Ga. Ct. App. 2013).

Paul Revere seeks to avoid this result by distinguishing *Mays,* arguing without citation that because Royal is the sole shareholder of RCR there is such unity of interest between RCR and Royal that "RCR should not be able to deny the applicability of the tolling provision . . . ." *See* ECF No. 60 at 10-11. This argument sounds in "outsider reverse veil-piercing" which "extends th[e] traditional veil-piercing doctrine to permit a third-party creditor to 'pierce[] the veil' to satisfy the debts of an *individual* out of the corporation's assets." *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 306 F.3d 126, 134 (4th Cir. 2002) (second alteration in original) (quotation omitted); *see also* Kathryn Hespe, *Preserving Entity Shielding: How Corporations Should Respond to Reverse Piercing of the Corporate Veil,* 14 J. Bus. & Sec. L. 69, 76 (2013) ("In an outside reverse veil piercing claim, a third party seeks to pierce the corporate veil to impose liability of the corporation in order to satisfy the personal debts of shareholders.").

The Supreme Court of Georgia has rejected outsider reverse-veil piercing as a theory of recovery, concluding that the theory is "a radical change in the concept of piercing the corporate veil in [Georgia] and, thus, should be created by the General Assembly and not by [the courts]." *Acree McMahan,* 585 S.E.2d 873, 875 (Ga. 2003). Therefore, Paul Revere "cannot use this rejected theory to support [its] claim," *Lollis v. Turner,* 654 S.E.2d 229, 232 (Ga. Ct. App. 2007), that O.C.G.A. § 9-3-99 should

---

[7] The Court does not dispute that O.C.G.A. § 9-3-99 is "a statute of repose." *See Mays v. Target Corp.,* 743 S.E.2d 603, 605 (Ga. Ct. App. 2013). Rather, the Court concludes that O.C.G.A. § 9-3-99 "frames the time period in which a right may accrue," *see Rosenberg v. Falling Water, Inc.,* 709 S.E.2d 227, 230 (Ga. 2011), in this case as starting with either the representations constituting the alleged crime *or* the act giving rise to Paul Revere's action in tort—i.e., Paul Revere's discovery of the alleged fraud.

toll claims that apply to RCR, despite the fact that RCR "was not accused of any crime of which [Paul Revere] was a victim." *See Mays*, 743 S.E.2d at 605.

Because the limitations period on Paul Revere's Fraud claim was only tolled until somewhere between May 2006 and October 31, 2006, and more than four years elapsed between October 31, 2006, and December 15, 2010, Paul Revere's fraud claims as to RCR are time-barred.

## V. CONCLUSION

Though this Order has covered significant ground, its findings are easily summed up. First, the Court found that there is an absence of evidence in the record showing that Defendants owe Royal benefits for any of the claimed periods. Therefore, the Court *GRANTS* Defendants' motion for summary judgment, ECF No. 35. Second, the Court found that Paul Revere produced sufficient evidence to create an issue of fact as to whether the statute of limitation bars its counterclaim. However, the Court also found that tolling under O.C.G.A. § 9-3-99 is improper as to RCR, because RCR was not subject to criminal prosecution for the alleged crimes that gave rise to Paul Revere's cause of action. Accordingly, the Court *DENIES* Plaintiffs' motion for summary judgment as to the counterclaim against Royal, but *GRANTS* Plaintiff's motion for summary judgment as to the counterclaim against RCR, ECF No. 37.

This Order thus leaves Paul Revere's counterclaim against Royal as the only live claim in this case. Accordingly, the Clerk is *ORDERED* to remove New York Life Insurance Company, Unum Group, and

RCR from this case. Royal and Paul Revere are *ORDERED* to submit a pretrial order within thirty days.

In light of this Order, Royal's motion for extension of time to file supplemental sur replies, ECF No. 63, is *DENIED* as moot.

This ___ day of January 2015.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

31